IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

JUDY HOLLINGSWORTH                                                    PLAINTIFF

VS.                                    CIVIL NO. 06-5208

MICHAEL J. ASTRUE[1], COMMISSIONER
SOCIAL SECURITY ADMINISTRATION                                       DEFENDANT

## MEMORANDUM OPINION

Judith Hollingsworth ("plaintiff"), brings this action pursuant to § 205(g) of the Social

Security Act ("the Act"), 42 U.S.C. § 405(g), seeking judicial review of a final decision of the

Commissioner of the Social Security Administration denying her applications for disability insurance

benefits ("DIB") and supplemental security income ("SSI"), under Titles II and XVI of the Act.

**Background:**

The applications for DIB and SSI now before this court were filed on February 17. 2004,

alleging an inability to work since February 4, 2004, due to degenerative disc disease ("DDD"),

foraminal stenosis, degenerative arthritis of the left knee, and early traumatic arthritis in the right

ankle.  (Tr. 51-53, 57, 536-538).  An administrative hearing was held on October 24, 2005.  (Tr.

544).

At the time of the administrative hearing, plaintiff was forty-five years old and possessed a

high school education with training and past relevant work experience as a licensed practical nurse

("LPN").  (Tr. 51, 58, 63).

---

[1]Michael J. Astrue became the Social Security Commissioner on February 12, 2007.  Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Michael J. Astrue has been substituted for Commissioner Jo Anne B. Barnhart as the defendant in this suit.

The Administrative Law Judge ("ALJ"), issued a written decision on June 1, 2006.  (Tr. 11-19).  The ALJ determined that plaintiff suffered from a combination of severe impairments but that they did not meet or equal the criteria of any of the impairments listed in Appendix 1, Subpart P, Regulations No. 4.  (Tr. 13-15).   After discrediting plaintiff's subjective allegations, the ALJ concluded that she maintained the residual functional capacity ( "RFC") to lift and/or carry 5-10 pounds less than occasionally and not repetitively; lift and/or carry 0-5 pounds from 1/3 to 2/3 of the workday but not repetitively; walk a total of two hours per day with normal breaks; walk or stand for 15 to 30 minutes at a time before having to sit down; and, sit 6 hours per day with normal breaks but must stand every hour for a few seconds before resuming a seated position.  Further, the ALJ determined that plaintiff could never climb, balance, stoop, crouch, kneel, or crawl and must avoid exposure to unprotected heights and moving machinery. (Tr. 15). With the assistance of a vocational expert, the ALJ concluded that plaintiff could still perform work as a cardiac monitor, optometric assistant, interviewer, and a call out operator.  (Tr. 18).

On September 1, 2006, the Appeals Council declined to review this decision.  (Tr. 3-5).  Subsequently, plaintiff filed this action.  (Doc. # 1).  This case is before the undersigned by consent of the parties.  Both parties have filed appeal briefs, and the case is now ready for decision.  (Doc. # 9, 11).

**Applicable Law:**

This Court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. *Ramirez v. Barnhart*, 292 F.3d 576, 583 (8th Cir.

2002).  Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision.  The ALJ's decision must be affirmed if the record contains substantial evidence to support it.  *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003).  As long as there is substantial evidence in the record that supports the Commissioner's decision, the Court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the Court would have decided the case differently.  *Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001).  In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed. *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000).

It is well-established that a claimant for Social Security disability benefits has the burden of proving her disability by establishing a physical or mental disability that has lasted at least one year and that prevents her from engaging in any substantial gainful activity.  *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *see* 42 U.S.C. § § 423(d)(1)(A), 1382c(a)(3)(A).  The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. § § 423(d)(3), 1382(3)(c).  A plaintiff must show that her disability, not simply her impairment, has lasted for at least twelve consecutive months.  *Titus v. Sullivan*, 4 F.3d 590, 594 (8th Cir. 1993).

AO72A
(Rev. 8/82)

The Commissioner's regulations require her to apply a five-step sequential evaluation process to each claim for disability benefits:  (1) whether the claimant has engaged in substantial gainful activity since filing her claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given her age, education, and experience. *See* 20 C.F.R. § § 404.1520(a)- (f)(2003).  Only if the final stage is reached does the fact finder consider the plaintiff's age, education, and work experience in light of his or her residual functional capacity.  *See McCoy v. Schweiker*, 683 F.2d 1138, 1141-42 (8th Cir. 1982); 20 C .F.R. § § 404.1520, 416.920 (2003).

**Evidence Presented:**

In May 1999, plaintiff was treated for back pain after overworking in her yard.  (Tr. 397). She reported chronic problems with a disc in her lower back and stated that epidural steroid injections had been helpful in the past.  An examination revealed tenderness in the paraspinous muscles of the lumbosacral spine with pain greater on extension than flexion.  (Tr. 397).

Records indicate that plaintiff had undergone many epidural steroid injections in the past. (Tr. 213-223, 243-259, 272-306, 319-325).  Plaintiff was also regularly prescribed Voltaren XR and Skelaxin to treat her chronic back pain.  An MRI of her lumbar spine conducted in August 2002 revealed mild disc space narrowing and disc desiccation with concentric annular disc bulges at the L4-5 and L5-S1 levels.  (Tr. 224).

4

In November 2002, plaintiff was treated for anxiety and episodes of severe stress. (Tr. 376-377). Plaintiff was diagnosed with situational anxiety and prescribed Xanax for short-term use. Dr. Wilson also increased plaintiff's Effexor dosage. (Tr. 377).

On December 10, 2003, plaintiff was treated for lower back and right leg pain. (Tr. 132-133). A recent MRI demonstrated disc degeneration with bulging of the disc at the L4-5 level. Dr. Cannon noted that plaintiff had undergone epidural injections in the past and found those to be very effective. (Between January 22, 2003 and May 19, 2005, plaintiff underwent a total of 10 epidural steroid injections. (Tr. 106-116, 267-271, 311-312, 478)). An examination revealed tenderness to palpation across the lumbosacral spine over the sacroiliac joints and a limited range of motion with flexion and extension. Plaintiff also had a positive straight leg raise on the right and decreased right L5-S1 level dermatome. Dr. Cannon diagnosed her with sciatica of the right lower extremity, right L5-S1 radiculopathy, lower back pain, DDD of the lumbar spine, and disc protrusion/herniation at the L4-5 level. Dr. Cannon then administered a lumbar epidural steroid injection. (Tr. 132-133, 412-413).

In January and February 2004, plaintiff was treated for bronchitis and a migraine headache. (Tr. 369-370). She was directed to push fluids, continue with over the counter cold/sinus medications, and to use Afrin nasal spray as needed. Warm compresses on the face and Clarinex were also recommended. (Tr. 370).

On February 24, 2004, Dr. Cannon noted that plaintiff would need to be off work for 4 weeks due to her back impairment. (Tr. 117-118).

5

On March 11, 2004, plaintiff complained of lower back pain that radiated down her leg. (Tr. 367). At this time, her blood pressure was 134/84. (Tr. 367).

On May 4, 2004, Dr. Wilson diagnosed plaintiff with sciatica, radiculopathy, lower back pain, DDD of the lumbar spine, and disc protrusion/herniation at the L4-5 level. (Tr. 158-159, 171-173, 365-367, 416-418). He indicated that she had undergone a total of 9 epidural steroid injections and was taking Lotrel, Imitrex, Effexor SR, Bextra, Ultram, Skelaxin, and Flexeril. Dr. Wilson noted that plaintiff had been examined by Dr. Raben and Dr. Cannon and was determined not to be a surgical candidate. (Tr. 173). Due to her condition, he stated that she could do no repetitive bending or twisting and should lift or carry no more than 10 pounds. (Tr. 159).

On May 17, 2004, plaintiff reported swelling in her feet and legs. (Tr. 364). Plaintiff was told to restrict her salt intake. (Tr. 364).

On June 7, 2004, records reveal that plaintiff had been switched from Lotrel to Benicar HCT ten days prior, due to edema. (Tr. 157, 169-171, 356-358). The Benicar was reportedly causing dizziness, weakness, and headache. At the time of her appointment, plaintiff brought her blood pressure log, which revealed readings between 120-150/80-90 with a pulse of 102-118. Dr. Wilson noted that the edema had significantly improved with the medication switch. However, because her potassium level was on the low end of normal, he directed her to take K-Dur. Dr. Wilson diagnosed plaintiff with hypertension and tachycardia. (Tr. 157). He also reported her history of seasonal allergies, frequent sinusitis, and migraine headaches. (Tr. 168). Records indicate that plaintiff was taking Effexor XR, Ultram, Skelaxin, and Flexeril. Further, due to the side effects, Dr. Wilson

directed plaintiff to discontinue the Benicar HCT and Lotrel.   He then prescribed Hydrochlorothiazide and Toprol XL.  (Tr. 169, 342).

On July 13, 2004, plaintiff indicated that she was feeling good.  (Tr. 339).  Dr. Wilson's nurse also noted that plaintiff's blood pressure medication was working, as her blood pressure was 130/80.  Plaintiff was given refills of Toprol XL, Effexor XR, Hydrochlorothiazide, and Potassium sustained release tablets.  (Tr. 339).

On July 26, 2004, plaintiff was evaluated by Dr. D. Wayne Brooks.  (Tr. 195-196).  Plaintiff rated her back pain as a 4 on a scale of 1 to 10 and stated that she could only function at about 40% capacity.  She indicated that her pain was exacerbated by activity, prolonged sitting, and remaining in any position for a long period of time.  Further, plaintiff stated that she experienced difficulty initiating sleep and staying asleep.  On a diagram, plaintiff indicated that her pain was in her back, radiated down both legs and into her right calf and flank area, with associated numbness, stabbing, and aching pain in her right hip.  A functional capacity evaluation revealed that plaintiff could occasionally lift 20 pounds but nothing over 20 pounds on any occasion; occasionally use the stairs or a ladder, crouch, squat, reach below shoulder height, and push and pull; and, frequently reach at shoulder level.  (Tr. 200-206).  The assessment also determined that plaintiff would need to have sedentary activity with the ability to shift among standing, walking, and sitting as needed for pain control.  The therapist stated that plaintiff might be able to work for a total of 4 hours but did not think she could do a continuous 4 hours of work at that time.  Dr. Brooks agreed with this assessment and felt that plaintiff should not continue working as an LPN under her current job

AO72A
(Rev. 8/82)

requirements. (Tr. 194, 196). He prescribed physical therapy and recommended a pool program with a home exercise regimen. (Tr. 194, 196).

On August 30, 2004, plaintiff had a follow-up with Dr. Brooks. (Tr. 193). Records indicate that she was doing better and that the physical therapy had been "very helpful." Dr. Brooks noted that plaintiff was independent with regard to her activities of daily living and mobility. Further, she was reportedly doing a home exercise program, staying active, and beginning a self-directed pool program. An examination revealed that plaintiff was moving her lower extremities well. However, she had only a fair range of motion in her back with tenderness in the lower lumbar region. Dr. Brooks directed her to continue her home exercise program. (Tr. 193).

On September 24, 2004, plaintiff was treated for a headache. (Tr. 337, 352). She indicated that Imitrex usually controlled her headaches but was not working on this occasion. Plaintiff also had worsening sinus congestion and pressure. Dr. Wilson gave her injections of Nubain and Phenergan, as well as a prescription for Augmentin. (Tr. 337-338, 352-353).

On November 1, 2004, Dr. Wilson noted that plaintiff's mood and affect were normal and her judgment and insight were appropriate. (Tr. 336-337). Plaintiff was given refills of Bextra, Ultram, and Skelaxin and told to return if her symptoms worsened. (Tr. 337).

On January 1, 2005, Dr. Wilson wrote a letter indicating that he had been treating plaintiff for complaints arising from her DDD. He indicated that plaintiff was taking pain medication throughout the day and should not sit for long periods of time. (Tr. 93).

8

On March 16, 2005, Dr. Wilson gave plaintiff a note saying that she could not sit or stand for long periods of time and would be precluded from performing jury duty. (Tr. 335).

From April 2005 until October 2005, plaintiff underwent physical therapy for her right shoulder.

On June 25, 2005, plaintiff was treated for right ankle pain after missing a step. (Tr. 504). X-rays revealed an extensive trimalleolar fracture and dislocation. Plaintiff was admitted and underwent open reduction and internal fixation. Initially, she was placed on Morphine which did not work well. Plaintiff was then switched to Demerol and prescribed inpatient physical therapy. She was released home on July 1, 2005, after reporting that she felt better. (Tr. 514).

On July 7, 2005, plaintiff had a moderate amount of swelling about her foot and ankle with no tenderness in the foot. (Tr. 535). Her incision was healing nicely, but due to the swelling, Dr. Sites elected to keep her staples in until the following week. X-rays showed good alignment and position of the ankle mortise. Dr. Terry Sites directed her to remain nonweightbearing with maximal elevation and to continue her splint. He also prescribed Dilaudid. (Tr. 535).

On July 14, 2005, plaintiff's swelling had improved and her incisions were healing. (Tr. 534). Dr. Sites noted that she was showing excellent ability to dorsiflex her right ankle to neutral. X-rays revealed no interval change in position and alignment with some areas of incomplete reduction and a small step-off of the posterior malleolar fragment. After discussing plaintiff's treatment options, she elected to continue with her current treatment. Dr. Sites indicated that her ankle mortise looked good and, given the comminution at the medial malleolus, there was likely little

9

to be gained by manipulation of the fragments that were too small to provide any fixation other than suture or pin.  (Tr. 534).

On August 11, 2005, plaintiff reported that her ankle was much improved.  (Tr. 534).  The swelling had decreased and her cast was still fitting well around the foot and ankle area.  X-rays continued to show no interval loss and intact hardware.  (Tr. 534).

From September 2005 until October 2005, plaintiff underwent physical therapy for her right ankle.  (Tr. 452-477).  On September 12, 2005, plaintiff reported some pain over the lateral aspect of her right ankle but was otherwise doing well.  (Tr. 532).  Dr. Sites directed her to continue progressive weightbearing in a cam walker and start motion exercises in therapy.  (Tr. 532).

On October 4, 2005, plaintiff presented at Dr. Wilson's office with complaints of severe lower back pain that radiated into her right leg and down below the knee.  (Tr. 484).  Although she was taking Ultram and Lodine, plaintiff reported no pain relief.  An examination revealed mild tenderness in the lumbar musculature with a normal mood and affect.  Dr. Wilson indicated that plaintiff should not lift over 10 pounds and should not repetitively bend or twist.  As plaintiff had an upcoming follow-up with Dr. Sites, Dr. Wilson advised her to ask him if it would be safe to perform an MRI and undergo a course of steroids.  He then prescribed Narco.  (Tr. 485).  At this time, plaintiff's blood pressure was 128/86.  (Tr. 490).

On October 10, 2005, plaintiff was making excellent progress and showing much improvement.  (Tr. 532).  She still had some pain over the lateral ankle area, but none medially.  Further, repeat x-rays showed no interval loss of position or alignment and evidence interval healing.

10

Dr. Sites placed plaintiff into an aircast with regular shoes and ordered progressive therapy for balance and strengthening. (Tr. 532).

On November 7, 2005, plaintiff complained of some pain in her right ankle. (Tr. 530). An examination revealed some pain with palpation along the tendon medially. Ankle motion was very good, as was subtalar motion. Repeat x-rays showed good maintenance of position and alignment with a small incongruity but no loss of joint space. Dr. Sites advised plaintiff to back off her therapy, as that seemed to initiate her pain, and prescribed a Medrol dosepak and anti-inflammatories. (Tr. 530).

On November 28, 2005, plaintiff reported improvement. (Tr. 530). The posterior pain in her right ankle was gone, although she continued to experience some lateral pain. X-rays continued to show good position and alignment with interval healing of the fractured area. Further, an examination revealed a good range of motion with no crepitus and no tenderness. Dr. Sites noted that plaintiff was able to participate in a home exercise program and recommended that she continue. He also advised her to continue with activities as tolerated. (Tr. 530).

On December 15, 2005, plaintiff reported sharp pain over the lateral and medial aspect of her left knee. (Tr. 529). She also noted swelling and stiffness. An examination revealed a mild-to-moderate amount of effusion and limited flexion. Plaintiff had a good straight leg raise and good quad set but was tender over the medial and lateral joint spaces. Stability tests were normal in all planes and x-rays demonstrated no specific abnormalities. Dr. Sites suspected a torn medial and/or lateral meniscus and ordered an MRI. (Tr. 529).

11

On December 19, 2005, plaintiff underwent an MRI of her left knee. (Tr. 500). It revealed a recent injury in the medial collateral ligament with partial separation of the mid-body of the medial meniscus and probably subtle tearing in the inferior articular surface of the mid-body of the medial meniscus. The results also indicate that this condition was complicated by a large effusion and a Baker's cyst. (Tr. 500).

On December 22, 2005 plaintiff followed up with Dr. Sites. (Tr. 528). After reviewing the MRI results with her, plaintiff elected to undergo outpatient surgery. (Tr. 528).

On December 28, 2005, plaintiff sought emergency treatment for a headache. (Tr. 492-497). A CT scan of her head was negative. Plaintiff also reported lightheadedness. Records indicate that she had taken 3 Toprol prior to her presentation at the ER. As her blood pressure remained elevated, plaintiff was prescribed Benicar and directed to continue the Toprol. (Tr. 492-497).

On December 29, 2005, plaintiff returned for a post-operative appointment with Dr. Sites. She indicated that her calf and thigh were soft and tender. Dr. Sites prescribed outpatient therapy and advised her to take Glucosamine, as her stomach did not do well with anti-inflammatories. (Tr. 528).

On January 24, 2006, Dr. Robert Thompson evaluated plaintiff. (Tr. 443-450). Plaintiff complained of pain radiating into her right hip, down her right leg, and stopping in the area of her knee. She also reported slight tingling, tenderness, and weakness in her right leg. Further, plaintiff indicated that she had suffered a trimalleolar fracture and had undergone surgery on June 26, 2005, resulting in some pain, soreness, swelling, and lack of endurance when standing on this ankle.

12

Plaintiff also complained of degenerative problems in her left knee, resulting in arthroscopic surgery on December 23, 2005. An examination revealed a normal range of motion in the cervical spine, upper extremities, and the lower extremities. The lumbar spine was limited in forward flexion to about 50 degrees, had about 15 degrees of extension, and normal lateral bending. There was a decreased range of motion in plaintiff's left wrist due to a prior fracture. Her fingers and hands were palpably cold and shiny, giving the appearance of Raynaud's phenomenon. Palpable warmth and swelling were also noted in her right ankle. X-rays revealed traumatic arthritic changes in the right ankle that corresponded to the warmth and swelling. Testing also revealed DDD primarily at the L5-S1 level with narrowing of the disc space and some foraminal stenosis and degenerative arthritic changes in the left knee. (Tr. 445). As such, Dr. Thompson concluded that plaintiff could lift a maximum of 5 pounds frequently; stand and/or walk for a total of 2 hours during an 8-hour workday for 15-30 minutes at a time without interruption; sit for a total of 6 hours during an 8-hour workday for 1-2 hours without interruption; never climb, balance, stoop, crouch, kneel, or crawl; and, should avoid exposure to heights and moving machinery.

**Discussion:**

We first address the ALJ's assessment of plaintiff's subjective complaints. The ALJ was required to consider all the evidence relating to plaintiff's subjective complaints including evidence presented by third parties that relates to: (1) plaintiff's daily activities; (2) the duration, frequency, and intensity of her pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of her medication; and (5) functional restrictions. *See Polaski v. Heckler*, 739 F.2d 1320,

1322 (8th Cir. 1984).  While an ALJ may not discount a claimant's subjective complaints solely because the medical evidence fails to support them, an ALJ may discount those complaints where inconsistencies appear in the record as a whole.  *Id*.  As the United States Court of Appeals for the Eighth Circuit  recently observed, "Our touchstone is that [a claimant's] credibility is primarily a matter for the ALJ to decide."  *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003).

After reviewing the record, we believe that the ALJ adequately evaluated the factors set forth in *Polaski*, and conclude there is substantial evidence supporting his determination that plaintiff's complaints were not fully credible.  The testimony presented at the hearing as well as the medical evidence contained in the record are inconsistent with plaintiff's allegations of disability.

The record currently before the court reveals that plaintiff does have an extensive record of treatment for DDD and bulging discs in her back.  However, plaintiff was prescribed only conservative treatment for this condition, namely pain medications, muscle relaxers and epidural steroid injections. *See Gowel v. Apfel*, 242 F.3d 793, 796 (8th Cir. 2001) (holding fact that physician prescribed conservative treatment weighed against plaintiff's subjective complaints).  Plaintiff even testified that her pain medications and muscle relaxers helped "a lot."  (Tr. 579).  *See Roth v. Shalala*, 45 F.3d 279, 282 (8th Cir. 1995) (holding that a condition that can be controlled or remedied by treatment cannot serve as a basis for a finding of disability).  In August 2004, plaintiff reported that the physical therapy was very helpful and was reportedly doing a home exercise program, staying active, and beginning a self-directed pool program.  (Tr. 193).  Dr. Brooks even noted that plaintiff was independent with regard to her activities of daily living and mobility.  This

14

was in spite of the fact that plaintiff continued to have some range of motion limitations in her back and lower lumbar region. Therefore, while we realize that plaintiff's medications and physical therapy may not have totally alleviated her discomfort, the mere fact that working may cause her some pain or discomfort is not enough to find plaintiff's condition to be disabling. *See Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000) (holding that mere fact that working may cause pain or discomfort does not mandate a finding of disability). Clearly she was capable of performing some activities despite her impairments.

Likewise, plaintiff has a history of arthritis in her left knee. In December 2005, she underwent arthroscopic surgery for this condition. (Tr. 529). By January 2006, plaintiff had a full range of motion in both extremities with no limitations. As it appears that plaintiff's knee impairment improved following surgery, we can not say that the ALJ erred in concluding that plaintiff's impairment did not meet or equal a listed impairment. *See Roth*, 45 F.3d at 282.

In addition, we note that plaintiff fell and suffered a trimalleolar fracture for which she underwent surgery in June 2005. (Tr. 504-514). Progress notes indicate that she improved following surgery, and repeat x-rays showed good position and alignment. (Tr. 529-535). In November 2005, a physical examination revealed a good range of motion with no crepitus or tenderness. (Tr. 530). Further, in January 2006, no limitations were noted with regard to the range of motion in the ankle, although x-rays revealed traumatic arthritic changes in the right ankle. (Tr. 445-447). On examination, there was only palpable warmth and swelling noted in the area of the ankle. (Tr. 423-450). *See Woolf v. Shalala*, 3 F.3d at 1213 (holding that, although plaintiff did have degenerative

15

disease of the lumbar spine, the evidence did not support a finding of disabled). As the records clearly indicate that plaintiff's ankle pain was improving, we find substantial evidence to support the ALJ's determination. *See Roth*, 45 F.3d at 282.

Records also reveal that plaintiff was treated via medication for high blood pressure. However, aside from one flare-up in 2004 and another in 2005, it appears that plaintiff's condition was well maintained via medication. In fact, there is nothing in the record to suggest that plaintiff's high blood pressure inhibited her ability to perform work-related activities. *See Forte v. Barnhart*, 377 F.3d 892, 895 (8th Cir. 2004) (holding that lack of objective medical evidence is a factor an ALJ may consider).

Additionally, plaintiff alleges disability due to depression and contends that the ALJ failed to properly consider this impairment. Here again, plaintiff testified that she had been taking Effexor for three years and that it worked "pretty well." (Tr. 580-581). *See Roth*, 45 F.3d at 282. Further, she indicated that she experienced no side effects from this medication. (Tr. 581). We also note that plaintiff sought treatment for depression related symptoms on very few occasions during the relevant time period. *Hutton v. Apfel*, 175 F.3d 651, 655 (8th Cir. 1999) (failure of claimant to maintain a consistent treatment pattern for alleged mental impairments is inconsistent with the disabling nature of such impairments). As such, we can not say that this impairment, standing alone or considered in conjunction with plaintiff's other impairments, was disabling.

Plaintiff's own reports of her level of activity also undermine her subjective complaints. On her supplemental interview outline, plaintiff reported the ability to care for her personal hygiene,

16

iron, shop for clothing, go to the bank and post office, prepare meals, pay bills, use a checkbook, count change, drive for short trips, walk short distances, attend church, watch TV, listen to the radio, read, visit friends and family, do needlepoint, sew, and swim a short distance.  (Tr. 66-67, 78-79). Plaintiff also testified that she performed home exercises consisting of stretching and walking ½ mile 3 times per week.  (Tr. 579).  *See Pena v. Chater*, 76 F.3d 906, 908 (8th Cir. 1996) (ability to care for one child, occasionally drive, and sometimes go to the store); *Nguyen v. Chater*, 75 F.3d 429, 430-31 (8th Cir. 1996) (ability to visit neighbors, cook, do laundry, and attend church); *Novotny v. Chater*, 72 F.3d at 671 (ability to carry out garbage, carry grocery bags, and drive); *Johnston v. Shalala*, 42 F.3d 448, 451 (8th Cir. 1994) (claimant's ability to read, watch television, and drive indicated her pain did not interfere with her ability to concentrate); *Woolf v. Shalala*, 3 F.3d 1210, 1213-1214 (8th Cir. 1993) (ability to live alone, drive, grocery shop, and perform housework with some help from a neighbor).  Clearly, this level of activity is inconsistent with plaintiff's allegations of disability.

Plaintiff contends that the ALJ failed to consider her impairments in combination.  However, we note that the ALJ considered all of the impairments that would hinder plaintiff's ability to perform work-related activities.  Therefore, although it is clear that plaintiff suffers from some degree of pain, she has not established that she is unable to engage in any and all gainful activity. Neither the medical evidence nor the reports concerning her daily activities supports plaintiff's contention of total disability.  *Gwathney v. Chater,* 104 F.3d 1043, 1045 (8th Cir.1997) (holding that "[t]he ALJ may discount subjective complaints of physical and mental health problems that are

inconsistent with medical reports, daily activities, and other such evidence). Accordingly, we conclude that substantial evidence supports the ALJ's conclusion that plaintiff's subjective complaints were not totally credible.

Plaintiff also contends that the ALJ erred with regard to his RFC determination. It is well settled that the ALJ "bears the primary responsibility for assessing a claimant's residual functional capacity based on all relevant evidence." *Roberts v. Apfel*, 222 F.3d 466, 469 (8th Cir. 2000). The United States Court of Appeals for the Eighth Circuit has also stated that a "claimant's residual functional capacity is a medical question," *Singh v. Apfel*, 222 F.3d 448, 451 (8th Cir. 2000), and thus, "some medical evidence," *Dykes v. Apfel*, 223 F.3d 865, 867 (8th Cir. 2000) (per curiam ), must support the determination of the plaintiff's RFC, and the ALJ should obtain medical evidence that addresses the claimant's "ability to function in the workplace." *Nevland v. Apfel*, 2 04 F.3d 853, 858 (8th Cir. 2000). Therefore, in evaluating the plaintiff's RFC, *see* 20 C.F.R. § 404.15459(c), while not limited to considering medical evidence, an ALJ is required to consider at least some supporting evidence from a professional. *Cf. Nevland v. Apfel*, 204 F.3d at 858; *Ford v. Secretary of Health and Human Servs.*, 662 F. Supp. 954, 955, 956 (W.D. Ark. 1987) (RFC was "medical question," and medical evidence was required to establish how claimant's heart attacks affected her RFC).

In the present case, the ALJ considered the medical assessments of a non-examining agency medical consultant, a general physical examination, plaintiff's subjective complaints, and her medical records. On May 4, 2004, Dr. Ronald Crow, a non-examining, consultative physician, completed an RFC assessment. (Tr. 181-188). After reviewing plaintiff's medical records, he

18

concluded that plaintiff could frequently lift and/or carry 10 pounds, occasionally lift and/or carry 20 pounds, stand and/or walk for about 6 hours in an 8-hour workday, and sit for less than 6 hours in an 8-hour workday.  No other limitations were noted.  (Tr. 181-188).

We also note Dr. Thompson's conclusion that plaintiff could lift a maximum of 5 pounds frequently; stand and/or walk for a total of 2 hours during an 8-hour workday for 15-30 minutes at a time without interruption; sit for a total of 6 hours during an 8-hour workday for 1-2 hours without interruption; never climb, balance, stoop, crouch, kneel, or crawl; and, should avoid exposure to heights and moving machinery.  (Tr. 443-450).  In addition, Dr. Wilson opined that plaintiff could do no repetitive bending or twisting and should lift or carry no more than 10 pounds. (Tr. 159).  A functional capacity evaluation even revealed that plaintiff could occasionally lift 20 pounds but nothing over 20 pounds on any occasion; occasionally use the stairs or a ladder, crouch, squat, reach below shoulder height, and push and pull; and, frequently reach at shoulder level.  (Tr. 200-206). The assessment also determined that plaintiff would need to have sedentary activity with the ability to shift among standing, walking, and sitting as needed for pain control.  (Tr. 196).

While we are cognizant of the fact that the therapist conducting the functional capacity evaluation concluded that plaintiff might be able to work for a total of 4 hours but did not think she could do a continuous 4 hours of work at that time, we can find no objective evidence to support this portion of the evaluation.  Although Dr. Brooks agreed with this assessment, the record is clear that the evaluation was conducted by a therapist who treated plaintiff on one occasion.  *See Jenkins v. Apfel*, 196 F.3d 922, 925 (8th Cir. 1999) (holding that the opinion of a consulting physician who

19

examined the plaintiff once or not at all does not generally constitute substantial evidence).  Dr. Brooks did not independently assess plaintiff's limitations.  In fact, the 4 hour limitation is not substantiated by any of the other medical evaluations contained in the file.  *See Haggard v. Apfel*, 175 F.3d 591, 595 (8th Cir. 1999) (holding that "[a] treating physician's opinion is afforded less deference when the medical evidence in the record as a whole contradicts the opinion."). Accordingly, we find substantial evidence to support the ALJ's determination that plaintiff could lift and/or carry 5-10 pounds less than occasionally and not repetitively; lift and/or carry 0-5 pounds from 1/3 to 2/3 of the workday but not repetitively; walk a total of two hours per day with normal breaks; walk or stand for 15 to 30 minutes at a time before having to sit down; and, sit 6 hours per day with normal breaks but must stand ever hour for a few seconds before resuming a seated position.  Further, that ALJ determined that plaintiff could never climb, balance, stoop, crouch, kneel, or crawl and must avoid exposure to unprotected heights and moving machinery.

We also find that substantial evidence supports the ALJ's finding that plaintiff can still perform work that exists in significant numbers in the national economy.  In a hypothetical question to the VE, the ALJ asked the VE to assume that the applicant had the same education and experience as plaintiff and could lift and/or carry 5-10 pounds less than occasionally and not repetitively; lift and/or carry 0-5 pounds from 1/3 to 2/3 of the workday but not repetitively; walk a total of two hours per day with normal breaks; walk or stand for 15 to 30 minutes at a time before having to sit down; and, sit 6 hours per day with normal breaks but must stand ever hour for a few seconds before resuming a seated position. (Tr. 587-588).  Based on this hypothetical, the VE testified that plaintiff

20

could perform work as a health technician, cardiac monitor technician, optometric assistant, interviewer, and call out operator. (Tr. 588-591). *See Long v. Chater*, 108 F.3d 185, 188 (8th Cir. 1997); *Pickney v. Chater*, 96 F.3d 294, 296 (8th Cir. 1996).

**Conclusion:**

Accordingly, we conclude that the ALJ's decision is supported by substantial evidence, affirm the Commissioner's decision, and dismiss plaintiff's Complaint with prejudice.

ENTERED this <u>19th</u> day of September 2007.

<u>/s/ *J. Marschewski*</u>
HON. JAMES R. MARSCHEWSKI
UNITED STATES MAGISTRATE JUDGE

21